## ALFRED G. BENSON *vs.* HIRAM KETCHUM.— SAMUEL F. TRACY *vs.* HIRAM KETCHUM.

B. and J., having chartered vessels to proceed to the Lobos Islands for guano, agreed, by contract, "in consideration of valuable services rendered" them, "in respect to the *obtaining access* to, and procuring *said guano*, by K., to pay him *a sum or sums of money, equal to the quarter part of their net profits*, on each and every vessel so chartered." This expedition was under the sanction of the State Department, which was then of opinion these islands did not belong to Peru, which opinion was afterwards retracted and followed by an official recognition, by our government, of the right of Peru to them. In consequence of an arrangement of our government, with the Peruvian Minister, the charter-parties of some of these vessels were recognized on certain conditions, to be effected through an agreement with the commercial agents of Peru in this country. B. then made an agreement with such agents, to endorse to them the charter-parties, and to receive therefor certain specified freights, provided the captains of the vessels agree to load at the *Chincas* instead of the *Lobos Islands*. From these freights the fund in controversy, in this case, arose. B. and J. subsequently entered into an agreement to define their mutual interests and liabilities in the guano expedition, and their relative rights as co-partners in all the charters of vessels, the arrangement between the government of the United States and Peru, and the moneys received, or to be received, on account thereof; and by this agreement they ascertained their interests to be equal, and that the liabilities in an annexed schedule should be paid as therein provided, but no payment to be made by either party without the consent of the other. In this schedule is "amount payable to K., *as per agreement*, and payable whenever B. and J. shall agree to pay the same, each advancing his half." The fund was brought under the direction of the court, in a suit by a third party, who claimed a lien on the the same for services rendered B. After this, K. filed *his bill* against B. and J., claiming *a lien* on this fund, under a contract with them, and asking an *account* of the profits of the expedition. HELD:

1st. That a court of equity has jurisdiction in such a case.

2nd. The proof showing that *access* was *not had* to the Lobos Islands, nor guano obtained from them, there was a *total failure of consideration* for the contract with K., and he cannot, in justice, found a claim for services wholly nugatory and valueless.

3rd. Nor can he maintain a *lien* on the fund, unless he was a *partner* in the charter-parties transferred to the agents of Peru, and his contract to receive a *sum of money*, "*equal to the quarter part of the net profits*," did not make him a *partner*.

An interlocutory order, under the Act of 1820, ch. 161, against a defaulting defendant, does not preclude him from the benefit of having testimony, which he may produce, considered before *final decree*.

APPEALS from the Circuit Court for Baltimore City.

The records in these appeals show, that on the 28th of March 1854, Tracy filed, in the court below, a bill against Benson and the Barredas, alleging, among other things, that Benson had agreed to pay Tracy one dollar per ton on all guano which might be imported into the United States by Benson, and praying that the Barredas might be enjoined from paying over to Benson certain funds in their hands, until this claim of Tracy, to a portion thereof, had been duly satisfied. Subsequently, $11,882 of this fund was invested, by agreement of the parties, and under order of the court, to await the decision of this claim set up by Tracy. Afterwards, on the 25th of January 1855, and before there was any determination of the controversy between Tracy and Benson, Ketchum filed his bill in the same court against Tracy, Benson, Jewett and the trustees of the fund, claiming an equitable lien thereon as against all these defendants.

The facts, upon which this claim or equity of Ketchum rests, are as follows: In the year 1852, or before, Benson and Jewett, of the city of New York, entertaining the opinion that the Lobos Islands were not within the jurisdiction of Peru, and were open to the vessels of the United States, determined to engage in an expedition to import guano in large quantities therefrom, but before doing this, desiring the protection and countenance of the government of the United States, Jewett addressed to Mr. Webster, then Secretary of State, a letter dated the 2nd of June 1852, in which he states, that he is informed that the guano on these islands may be as rightfully taken by citizens of the United States as of any other country, but being unwilling to violate any treaty of the United States, or any provisions of the law of nations, he requests to be informed by the secretary, whether citizens of the United States, in common with the rest of the world, would have the right to take this article of commerce from these islands.

Mr. Webster, in reply, by letter of the 5th of June 1852, states, that the Department was not aware that the Lobos Islands were either discovered or occupied by Spain or Peru, that their distance was too remote to make them a dependency

of these countries, that one Morrell, an American ship-master, might justly claim to be their discoverer, and that under these circumstances it might be considered the duty of the government of the United States to protect its citizens who might visit these islands for guano. He also promised to communicate a copy of his letter to the Secretary of the Navy, and suggest that a vessel of war be ordered to repair to these islands for the purpose of protecting from molestation any American citizens who might wish to take guano from them. In consequence of this communication, Mr. Graham, Secretary of the Navy, on the 16th of June 1852, instructed Com. McCauley, commanding the Pacific Squadron, to send a vessel to the Lobos Islands for the protection of the citizens and commerce of the United States. On the 30th of June 1852, Benson and Jewett entered into a contract with Ketchum, which is the foundation of his claim in this suit.

This contract recites, that Benson and Jewett had chartered a number of vessels to proceed to the Lobos Islands to obtain cargoes of guano, to be disposed of as an article of commerce, and intended to become interested in other vessels, for the same purpose, during the ensuing six months, and then declares, that "*in consideration of valuable services rendered us, in respect to obtaining access to and procuring said guano,* by Hiram Ketchum, of the City of New York, we" (Benson and Jewett) "do hereby jointly and severally promise said Hiram Ketchum *to pay him a sum or sums of money, equal to the quarter part of our net profits, on each and every ship,* (deducting first therefrom the expenses, commissions, &c., for doing the business,) as aforesaid chartered, and hereafter to be chartered, or caused to be chartered, by us, or either of us, during the ensuing six months, and in consideration of said services, we do hereby promise said Ketchum *an account of each and every vessel* chartered, or caused to be chartered, by us, or either of us, from time to time, and also *an account current to that date, showing the nett profits, from time to time, as said cargoes respectively may be sold.*"

On the 21st of August 1852, Mr. Webster wrote to Mr. Osma, the Peruvian Minister, his letter of that date, in which

he revises the question, and concludes with stating that the President thought it advisable that instructions should be sent to the chargè of the United States at Lima, and to the naval force in that quarter, to prevent collision. He promises also that no protection would be afforded to the authors of enterprises, claiming to be citizens of the United States, who might undertake to defend themselves, or their vessels, by force, in the prosecution of any commercial enterprises to these islands. Such acts he declares to be "acts of private war, and their authors would thereby justly forfeit the protection of their own government." On the 25th of August 1852, Mr. Kennedy, Secretary of the Navy, by direction of the President, instructed Com. McCauley to suspend the execution of the order of 16th of June 1852. On the 8th of September 1852, Benson wrote to the President of the United States his letter of that date, in which he claims the protection of, and indemnity from, the government of the United States. On the 20th of that month, Mr. Conrad, acting Secretary of State, informed Jewett, that intelligence had been received at the Department, that the vessels chartered to load with guano, at the Lobos Islands, might receive freight there, or at the other guano islands, on account of the Peruvian government, or the contractors for the export of the article from Peru. To this Jewett replied, by letter of the 22nd of September, that it was impossible for the parties interested to accept the arrangement proposed without ruin. On the 18th of November 1852, Benson applied to Mr. Secretary Everett for information in regard to a reported arrangement between the government of Peru and the United States, for a settlement of the Lobos Island difficulty. To this application the government appears to have made no reply, but on the 17th of November 1852, the Peruvian Minister addressed a letter to Mr. Everett, in which he expresses the satisfaction with which he has learned that the President had, after giving the subject the most serious attention, instructed the Secretary of State, in the name of his government, *to recognize the rights set up by Peru to the Lobos Islands.* He also expresses the pleasure with which he receives *the particular recommendation in favor of the vessels* despatched by the

citizens of the United States to the Lobos Islands, under the impression that they could freely take guano, and he offers, in the name of his government:

1st. To load on account of Peru, at the Chincas, at the rate of $20 per ton, *all American vessels which left the United States between the 5th of June and the 25th of August* 1852, for the Lobos Islands, *provided the owners or shippers would assign over their contracts to the consignees and agents of Peru in the United States.*

2nd. To take at a fair price for the Peruvian government, the instruments or utensils carried by said vessels, and intended for procuring guano.

3rd. To take, also, at the freight of $20 per ton, *vessels freighted in the Pacific, under orders from the United States, prior to the 25th of August 1852, and which could not have been recalled.* In conclusion, he expresses the hope that these measures will satisfy the *interest which the Secretary has manifested in favor of the persons who had sent their vessels to the Lobos Islands.*

On the 8th of January 1853, Benson entered into an agreement with the Barredas, then the sole commercial agents of Peru in the United States. This agreement states that it was entered into by the Barredas under the instruction of the Peruvian Minister, and "in accordance with the concessions made by him for the taking up, under charter for account of the Peruvian government, of the vessels chartered by Benson to be sent and loaded with guano at the Lobos Islands," and then sets forth several lists of vessels, amounting, in all, to forty-five, which might be embraced within its terms, and provides, generally, that upon the endorsement, by Benson, of the charters of these vessels to the agents of the Peruvian government, that government will furnish such vessels with cargoes of guano from the Chinca Islands, at $20 per ton freight on account of the Peruvian government, "provided that the captains of these vessels may agree to load at the Chinca Islands instead of the Lobos Islands," and "that the endorsement of Benson will be void and without effect for those charter parties of vessels whose captains, under any pretence, may

refuse to fulfil them." The Barredas were to pay to the ves-sels the freight stipulated in the charter parties, and "the *dif-ference* between the freight therein agreed and that of $20, allowed by the Peruvian Minister, will be paid to Benson on the same terms as to the vessels, with deduction of five per cent. commissions on total amount of freight at $20 that Benson agrees to pay to the Barredas." Fifteen vessels, only, delivered cargoes and were paid freight by the Barredas under this agreement, and *from the proportion of freight due Benson under this agreement, the fund in controversy arose.*

On the 24th of May 1853, Benson and Jewett entered into an agreement "for the purpose of defining their mutual and respective interests in the guano expedition, and their relative rights as co-partners in all the charters of vessels, the arrangement between the government of the United States and Peru, the moneys received, or to be received, on account thereof, and the liabilities therein." This agreement determines that "Benson and Jewett are co-partners in said business and matters, and the interest of each of the parties therein is equal, and their liabilities therein are also equal, and each party is entitled to one-half of all the proceeds thereof, and is bound to pay one-half of all the debts thereof, and neither party is authorised to sign any further agreement, incur any further liabilities, or conclude any further negotiations, without the consent of the other." It gives Benson the sole right of collecting all moneys due to the concern, with the stipulation that one-half shall be paid over, immediately on receipt thereof, to Jewett, and further provides that: "The mutual liabilities of the parties are declared to be equal and even, and the liabilities, in the annexed schedule stated, are to be paid *as therein provided, but no payment of any sum of money whatever shall be made by either party without the consent of the other.*" In the schedule of liabilities, annexed to this agreement, are the following: "C. Amount *payable to H. K. as per agreement,* and payable *whenever Benson & Jewett shall agree to pay the same, each advancing his half.*" "F. The liability, if any, to pay Samuel F. Tracy commissions for services, to be paid only when legally-compelled, or when agreed to by both

parties. In case Tracy commences an action to recover any sum claimed due him, Jewett agrees to give Benson a satisfactory guarantee to meet his half of any judgment to be obtained.''

The bill of Ketchum alleges that, in May 1852, Benson and Jewett entered into a partnership for the purpose of importing guano from the Lobos Islands, and applied to complainant, who is a member of the legal profession, for his professional and personal advice and assistance in their undertaking, and agreed to compensate him therefor, as stated in their agreement of the 30th of June 1852; that complainant did accordingly render, at and before the time of this agreement, his assistance and advice to, and materially assisted, said partners in obtaining access to, and procuring guano from said islands; that, subsequently to said agreement, and after many vessels had been chartered by said partners, and a number had sailed, the government of the United States disavowed the right of its citizens to take guano from these islands, and their title to its protection in so doing; that thereupon, after certain negotiations between our government and that of Peru, it was agreed that the Peruvian government should assume, upon certain conditions, the charter parties entered into by Benson and Jewett; that this arrangement was assented to by Benson for himself and Jewett, and was finally consummated by the agreement between Benson and the Barredas, the agents of the Peruvian government, of the 8th of January 1853; that, subsequently, Benson and Jewett entered into the agreement of the 24th of May 1853, regarding their said partnership interests and liabilities, to which they annexed a schedule of certain of their liabilities in reference to said partnership, in which the agreement of the 30th of June 1852, between them and complainant, is mentioned and admitted. The bill further alleges, that on the 3rd of May 1854, a bill was filed in the court below, by Jewett against Benson and the Barredas, to obtain an account and adjustment of said partnership matters, and a portion of the profits thereof, alleged to be awaiting Benson's order, in the hands of the Barredas, and that the answer of the latter thereto has been filed, with a statement of

43    v. 14.

the number of vessels assigned to them, the number of tons of
guano brought by such vessels, and, also, of the money re-
ceived for freight, and the amount subject to Benson's order;
that prior to these proceedings, on the 28th of March 1853, a
bill was also filed in the same court by Tracy against Benson
and the Barredas, alleging that Benson had agreed, for certain
valuable considerations, to pay him the sum of one dollar per
ton on all guano that might be imported into the United States
by Benson, and praying for an injunction to prevent the Bar-
redas from paying over to Benson any funds in their hands till
his claim to a portion of the same was satisfied; that the differ-
ence between Benson and Jewett having been amicably ar-
ranged, it was agreed between them and Tracy, and the Bar-
redas, that Tracy should abandon his claim against all the
fund in the hands of the Barredas, except the amount of
$11,882, which should be invested to await the result of his
suit, which was accordingly done, and the remainder of the
fund in the hands of the Barredas was paid over by them to
Jewett for Benson and himself, the bill of Jewett dismissed,
and also that of Tracy, as against the Barredas, so that there
remains of this fund, within the court's jurisdiction, only the
sum of $11,882, arising under the aforesaid charter parties,
and subject to complainant's equitable lien.   The bill further
charges that Benson and Jewett have received, under said
contract with the Peruvian government, more than $50,000,
clear nett profits, to one-fourth of which complainant is enti-
tled under his aforesaid contract with them, and which the said
sum of $11,882, so as aforesaid invested, subject to the court's
order, is insufficient to cover; that Tracy has no right or claim
to this fund, in any way, for the reasons that he rendered no
lawful service of any sort to Benson, or Benson and Jewett,
and the agreement made with him by Benson was made with-
out the knowledge of Jewett and against his wishes, as both
Benson and Tracy well knew, and because, in any event, the
lien of the complainant, as by the date of his agreement will
appear, was prior to that of Tracy, and ought, in equity, to
be first enforced.   The bill prays, among other things, for an
account from Benson and Jewett, of all moneys received by

them from all sales of guano brought into the United States in each and every vessel chartered by them, or either of them, prior to and during the six months next ensuing the 30th of June 1852, as well moneys received from the Barredas, as from all other persons, on account of sales of guano imported in such vessels, and of all expenses, commissions, &c., properly deducted by them from such moneys, and of the actual profits accruing to them from sales of guano imported in such vessels, and that they may pay over to complainant his proper share thereof, according to his aforesaid agreement with them, and that the whole of the money so invested may be paid over to him, or such part thereof as he is justly entitled to from Benson and Jewett, and for general relief.

Jewett, in his answer, admits the partnership with Benson, the agreement with the complainant, the rendition by him of the services contemplated thereby, the transfer of the charter parties to the agents of the Peruvian government, the subsequent agreement between himself and Benson, and the institution and arrangement of suits by himself and Tracy against Benson and the Barredas, as alleged in the bill. He denies that he ever entered into any contract with Tracy, or that Benson could have made any, which would give Tracy a claim upon the partnership funds. He also denies that he has received his full share of the partnership profits, and alleges that the amount invested by the order of the court, and that received by Benson, over and above his proper share, is more than sufficient to meet all the partnership liabilities. He further states his inability to answer concerning the number of tons of guano imported, or the amount received by Benson from the Barredas, Benson having managed that part of the business, but he believes the statement filed by the Barredas, in the suit instituted by himself against them and Benson, to be correct. He assents to a decree against the fund to the extent of such claim as the complainant may establish.

Benson, in his answer, admits the agreement with the complainant, and though denying that he rendered any service whatever, as contemplated by the contract, respondent alleges his willingness to carry out the agreement precisely as if such

services had been rendered. He avers, that after having char-
tered a number of vessels, and incurred great expense for the
adventure, the United States government disavowed the right
of its citizens to take guano from the Lobos Islands, in conse-
quence of which his vessels were prevented, by an armed
force from Peru, from loading at those islands, and as the sole
consideration of the agreement with the complainant was, that
the latter had stated that he had procured such access and
rendered such assistance, which respondent then fully believ-
ed he had done, and that his services were valuable on that
account, yet the complainant was mistaken and had deceived
himself and respondent, though unintentionally and without
fraud, and had not procured such access, but had wholly fail-
ed to remove or prevent the anticipated difficulty with Peru,
the removal or prevention of which was the sole consideration
for the agreement to pay for his services, and, therefore, the
consideration for the agreement has entirely failed, or in fact
never existed, and the complainant is neither, in law or in
equity, entitled to receive any thing thereon.   He further
avers, that the expedition was thus utterly broken up, and
having learned from public rumor, that he could probably
make some arrangement with the Peruvian government by
which he could be saved from ruin, he entered into such ar-
rangement as was virtually a transfer of the charter-parties,
held by him, to that government, and a total abandonment of
any idea of procuring cargoes for the vessels, on his own ac-
count.   He denies that he accepted or assented to any gov-
ernment arrangement, such as stated in the bill, and avers
that his arrangement with the Peruvian government is, in no
way whatsoever, connected with his contract with the com-
plainant, but is entirely new matter, which the complainant
has no right to inquire into or demand an account of.   He
further avers, that so far from having received any profit from
the adventure, it has resulted in heavy loss, he never having
received more than $15,000, and the expenses having already
largely exceeded this sum, and numerous suits are now pend-
ing against him for breach of these charter-parties, and that
the complainant can have no such interest as entitled him to

any payment out of the result of the expedition and sales and transfers of the charter, except on the principle that he is a partner, in which case he is responsible for a portion of the losses.

The trustees of the fund, in their answer, admit that they hold the same to abide the result of the controversy between Tracy and Benson, and aver they have no knowledge of the other matters alleged in the bill, except the filing of the bills by Tracy and Jewett against Benson and the Barredas, which they admit.

Tracy appeared but failed to answer, and an interlocutory decree was obtained against him, under which a commission to take testimony was ordered to be issued, and it was agreed as between the complainant and the defendants, who were not in default, that such commission shall be taken as a commission-in-chief. The testimony taken shows substantially the facts heretofore stated.

The cause having been set down for hearing, Benson filed an exception, that under the contract sued on, and under the averments of the bill, the complainant cannot recover any part of the freights agreed to be paid to Benson, under the agreement of the 8th of January 1853, and likewise objected that the complainant's claim is properly cognizable in a court of law, and he, therefore, objects to the court's assuming jurisdiction thereof.

At the hearing, Tracy, by consent, filed his agreement with Benson, dated the 23rd of November 1852. This agreement, after reciting the charter of vessels by Benson, the refusal of Peru to permit them to visit the Lobos Islands, and in consequence of such refusal, the suspension, by our government, of its orders guaranteeing protection to its citizens, proceeds as follows: "And whereas said Tracy has induced Joaquin I. De Osma, the Minister from Peru, (in consideration of its being a final settlement of the Lobos Island question, between the government of the United States and that of Peru,) to consent to load all of the said vessels, for account of the Peruvian government, at a freight of $20 per ton, of 2240 pounds avoirdupois, for every ton of guano delivered at a port of dis-

charge.   Now, in consideration of the premises, the said Ben-
son hereby promises and agrees to pay to the said Tracy, his
his heirs or assigns, one dollar on each and every ton of guano
that shall be delivered by all of said vessels, and said one dol-
lar on each and every ton so delivered may be paid to said
Tracy by the agents of the Peruvian government, on present-
ment to them of this agreement, which payment so made shall
be in part payment of the amount that said Benson is to re-
ceive for the freights and charters of said vessels."

The cause was then argued by the solicitors of Tracy, as
well as those of the other parties, and on the 27th of March
1857, the court (KREBS, J.) delivered an opinion and passed
a decree, deciding the principal question in controversy in favor
of the complainant.   This decree is sufficiently stated in the
opinion of this court, and from it *Benson appealed.*

The cause having been, by this decree, referred to a special
auditor, for the purpose of stating the accounts between the
complainant and Benson and Jewett, directed to be taken
upon the pleadings and proof already in, and such other proof
as the parties might produce before him, it was agreed that a
commission should issue to New York to take testimony in
reference to such accounts, Benson, however, not thereby
waiving his appeal.   Tracy then moved for leave to file his an-
swer, accompanied by a paper intended as such answer.
This motion was never brought to a hearing or decided by the
court.   There was also an agreement filed, by which it was
agreed that the testimony taken by Tracy, in the suit pend-
ing between him and Benson, may be filed with the auditor,
or read before him or the court, as if the same had been taken
by Tracy, in this cause, after decree rendered, subject how-
ever to all exceptions and objections whatever, the purpose of
the agreement being only to save the time and expense of
taking said testimony over again in this case, but not to admit
any thing in regard to the right of Tracy, at this stage of these
proceedings, to take or offer any testimony in this cause, or in
regard to the admissibility or competency of the testimony in
question.   This testimony was brought up to this court by a
supplemental record, but need not be stated.   Tracy then ap-

pealed from so much of the order and decree of the 27th of March 1857, as is adverse to his claim.

The causes were argued before LE GRAND, C. J., TUCK and BARTOL, J.

*F. W. Brune,* for Benson, argued:

1st. That the contract between Ketchum, and Benson and Jewett, of the 30th of June 1852, which is the foundation of Ketchum's claim, cannot be enforced, 1st, because the considerations on which it rested, being for alleged services in seeking to obtain access to the Lobos Islands, for the purpose of procuring guano, while this was prohibited by Peru, to whom those islands belonged, and was also, in fact, discountenanced and condemned by our government in its correspondence with the Peruvian Minister; 2nd, because, by the fair interpretation of the contract, viewed in connection with all the surrounding circumstances, the services, which were the consideration for the contract and the subject of compensation, were the obtaining of the sanction and protection of the American government to the enterprise. This was considered certain after Mr. Webster's letter of the 5th of June 1852, to Jewett, and the contract was therefore signed, but this sanction and protection were emphatically and publicly disavowed by the President through the Secretary, in his letter of the 25th of August 1852, to the Peruvian Minister, and thus the real consideration of the contract failed; 3rd, because this was a secret agreement to use personal and professional influence with the Secretary of State and other public officers, to secure governmental action, and its subject-matter and mode of compensation was contrary to the policy of the law. 16 *How.,* 314, *Marshall vs. Balt. & Ohio Rail Road Co.* 7 *Md. Rep.,* 273, *Wildey vs. Collier.* Was there any contract by which Ketchum could ask this fund to be appropriated to him? It is not pretended that the fund was derived immediately from the contract of the 30th of June 1852. But what was this contract? and on what grounds do courts of equity specifically enforce contracts? The cases of *Carr vs. Hobbs,* 11 *Md. Rep.,*

294; *Elysville Manf. Co. vs. Okisko Co.*, 5 *Md. Rep.*, 159; *Stoddert vs. Bowie*, 5 *Md. Rep.*, 35; *Griffith vs. Frederick Co. Bank*, 6 *G. & J.*, 439; *Geiger vs. Green*, 4 *Gill*, 475, and *Rider vs. Gray*, 10 *Md. Rep.*, 285, show that the specific performance of contracts is not a *matter of right*, but rests in the sound discretion of the court, and that the contract must be fair, just, reasonable, *bona fide, certain* and mutual. Now, testing this contract by these principles, what is it? It is for valuable *services* rendered in *"obtaining access to"* and "procuring guano from" the Lobos Islands. By the contract, therefore, Ketchum was to get *access* to these Islands. What did he do? The record leaves it to *inference,* and it may be *inferred* that he had something to do with the procurement of the letter from Mr. Webster to Jewett. Did he give the Secretary false history as to the discovery of these islands? or did he impart to him false geographical information? or did he try to persuade and influence him? and, if so, did he disclose to him the fact that he had a large interest in the matter? By his contract he was to get *access* to islands belonging to a government with which ours was at peace, and enable Benson and Jewett to obtain guano therefrom. How was this to be done? Either by a filibustering expedition or by fair open action on the part of our government. If the former, then the contract was not fair and *bona fide;* if the latter, then he never got the sanction of our government to the enterprise; the letter of Mr. Webster was not written with the approbation of the President, and on the 25th of August, before a single vessel could arrive at these islands, whatever sanction or protection had been previously afforded by our government, was withdrawn, and the consideration for the contract, in this aspect of it, *entirely failed;* his services were utterly *valueless.* Again, was this contract *certain?* Was he to procure or secure access to these islands from our government, or that of Peru? In this respect it is uncertain, and in no aspect in which it can be viewed, is it one which a court of equity would enforce upon a bill filed for its specific execution.

2nd. If Ketchum can recover upon this contract at all, it should be by a suit *at law,* and equity has no jurisdiction in

Benson *vs.* Ketchum.

this case. The mere claim for an *account* made by the bill does not give equity jurisdiction. His claim, under this agreement, was properly cognizable at law. 7 *G. & J.*, 114, *Adair vs. Winchester.* 11 *G. & J.*, 426, *Oliver vs. Palmer, et al.* 2 *Md. Rep.*, 55, *Bull vs. Schuberth.* 7 *Md. Rep.*, 403, *Guyton vs. Flack.*

3rd. Under this contract, both at law and in equity, Ketchum can only recover a sum or sums equal to one-fourth of the profits, *after deducting expenses,* upon the guano contracted to be imported from the Lobos Islands in the vessels mentioned in the contract as chartered or to be chartered, and which guano was to be sold by Benson and Jewett as an article of commerce, and as not a pound of guano was imported by them from the Lobos Islands, while *very heavy expenses* were incurred in the expedition, Ketchum cannot recover anything under this contract.

4th. Under this contract, Ketchum, as a compensation for professional and personal services, stated to have been already rendered, was to receive a *sum equal to a quarter part of the net profits* from sales of guano, and not a proportion of the profits themselves. He had nothing to do with the contracts of charter, nor had he any interest in or control over them. The sums stipulated to be paid to him were a compensation for his supposed professional labor. This is not a controversy on the part of creditors to make Ketchum liable as a partner, but between the parties to the contract to ascertain its meaning, and under this contract Ketchum was not a partner with Benson and Jewett in the charters which were made, nor in the expedition itself, and, therefore, has no *lien* whatever upon this fund. 17 *Ves.*, 412, *Hamper, Ex-parte.* 6 *Gill*, 412, 423, *Kerr vs. Potter.* 7 *Gill*, 268, *Mason vs. Higgins.* 2 *Md. Rep.*, 16, *Glenn vs. Gill. Ibid.*, 55, *Bull vs. Schuberth.* 7 *Md. Rep.*, 403, *Guyton vs. Flack. Story on Part., secs.* 49, 56. *Collyer on Part., secs.* 25 to 44. 1 *Smith's Lead. Cases*, 980, 985, 981. 20 *Wend.*, 70, *Vanderburgh vs. Hull.* 13 *Barb.*, 304, *Hodgman vs. Smith.* 4 *Sandf.*, 321, *Ogden vs. Astor.* 6 *Metcalf*, 87, *Denny vs. Cabot.* 12 *Conn.*, 69, *Loomis vs. Marshall.*

44    v. 14.

5th. If he was not a partner under this contract, nor responsible for losses connected with the charters referred to in it, he can claim no interest in the agreement of the 8th of January 1853, between Benson and Barreda, as this agreement upon its face, in conformity with the arrangements between the two governments upon which it was based, was exclusively for the benefit of the parties *interested in the charters to the Lobos Islands,* made by Benson, which were to be assigned by him to the agents of Peru under this agreement. This agreement was an act of grace from Peru to Benson as the charter of these vessels in which Ketchum had no interest.

6th. Ketchum can claim no benefit from the agreement between Benson and Jewett of the 24th of May 1853. He is not a party to it. There was no new consideration moving from him on account of it. It excludes the idea that Ketchum was a partner in the matter to which it relates, and was a contract between Benson and Jewett for the sole purpose of defining or restricting, as *between themselves,* existing rights and liabilities under the Lobos Island expedition, and the agreement between Benson and Barreda, and was not for the purpose of creating new liabilities. Under Article C., in the schedule annexed to this agreement, any liability of Benson and Jewett to Ketchum is not recognized, but in fact denied, unless sustained by the subsequent voluntary joint agreement of Benson and Jewett to pay the same, which was not done.

*F. K. Howard* and *S. T. Wallis,* for Ketchum, argued:

1st. That by the agreement of the 30th of June 1852, between himself and Benson and Jewett, Ketchum became entitled, for a *past consideration* therein acknowledged, to a sum of money equal to one-fourth of the net profits on each and every cargo of guano imported into New York from the Lobos Islands, in the vessels therein referred to, after deducting expenses and commissions, and to an account of each of the vessels as chartered, and of the net profits of every cargo as sold, as well as to a lien on the profits specifically. The consideration recited in this contract is a *past* and *executed* consideration; it is not a contract *to procure* access to these islands,

but it recites that valuable services *have been rendered* by Ketchum, *in respect* to the obtaining access to them, and that such *access* was not *in fact* obtained, makes no difference, for if it did, then every attorney's fee would be contingent upon *success.* Ketchum stands upon the contract thus reciting a past and executed consideration, and it is for the parties who assail it, to show that there was immorality or dishonesty in it, or that it is against public policy. This they have not done. There is not a particle of evidence showing any immorality in the consideration, or that there was any thing dishonest about it. The answer sets up no such defence. Ketchum, in his bill, claims for professional services rendered, and if he furnished Mr. Webster with the geographical and historical information contained in his letter to Jewett, it was an honest and laudable service for which he should be as honestly paid. Nor has the consideration, in fact, failed. The answer of Jewett admits that the services were rendered; they were rendered when Mr. Webster wrote his letter to Jewett, and when the Secretary of the Navy ordered our squadron to protect the vessels going to these islands. This was the government protection which the services of Ketchum procured, and from these services the fund in this case was ultimately derived, as we shall show.

2nd. That upon the breaking up of the Lobos Island adventure by political causes, as stated in the evidence, Ketchum had an interest of one-fourth in the disposable value or possible profits of the charter-parties in question; that those charter-parties were assumed beneficially to the charterers by the Peruvian government, at the recommendation of the government of the United States, and expressly on the ground of the frustration of the plans of the parties interested as to the Lobos Islands, by such political action; that Ketchum was consequently within the consideration of the contract with the Peruvian government, and is entitled to be within its benefits, according to his proportionate interest of one-fourth in the charter-parties so assumed, transferred and made profitable. *5 Johns. Ch. Rep.*, 406, *Van Horne vs. Fonda.* That the substitution of the Barreda contract for the Lobos Island enter-

prise is not only confessed by Jewett in his answer, but is expressly recognized, together with the continuing interest of Ketchum in the profits of such substitution, by the memorandum or agreement of May 24th, 1853, between Benson and Jewett. Ketchum, therefore, is entitled to his accounts, as to the substituted contract, precisely as in regard to the subject matter of the original agreement, and to a lien upon the proceeds of such substituted contract as in his bill alleged. There can be no doubt that the subsequent agreement was connected with the original contract and adventure. This adventure was never given up or abandoned till the arrangement with Peru was accepted and substituted in its place. The letters of Benson to the President, and of Mr. Everett, Secretary of State, and of Mr. Webster and De Osma, show, that up to the 17th of November, our government did not relinquish its claim to these islands, and that the original adventure was not then abandoned. Till that period, the government was negotiating the settlement of the question, and making stipulations for the *benefit* and *protection* of parties interested in the expedition, and the agreement between Benson and Barreda was made on account of this interference on the part of our government. Ketchum was interested in the *identical charter-parties* which, under the altered circumstances of the relations between the two governments, were assigned to the agents of the government of Peru, and which ultimately worked out the profits of Jewett and Benson, constituting the fund now in court. The mistake or misapprehension of Mr. Webster, and of Ketchum, in regard to our rights to these islands, constituted the whole *stock in trade* of Benson and Jewett, and it was this mistake which merged the Lobos Island expedition into the Peruvian government contract for the Chinca Island guano. At one and the same time that our government gave up its claim, it made stipulation for the protection of our citizens, and it was a part of this shipwrecked expedition that procured the concession from the government of Peru. It was Ketchum's interest, and his services, and his labor, as well as those of Benson and Jewett, that *purchased* and *procured* the very fund now in court. Benson was the trustee to manage

the expedition for the benefit of all parties interested, and the agreement subsequently made between him and Jewett shows, that the amount due Ketchum was payable to him out of the partnership between them, because they had succeeded to the rights of the old expedition.

3rd. That the granting of the *accounts* and the enforcement of the *lien* referred to, were proper subjects of equitable interference, and that the court below decreed properly and with full justification, under the averments and prayers of the bill, in directing an account to be taken, and in making the fund, subject to the lien of Ketchum's claim, to be ascertained thereby. Assuming that Ketchum had rights under the substituted contract, he was clearly entitled to the *account* and discovery asked for in his bill, and in this view of the case alone, it is a proper one for equity jurisdiction, for the jurisdiction of equity, in cases of account, rests upon the ground that there is not full and adequate remedy at law. 11 *G. & J.*, 470, *Stonebraker vs. Kline.* 13 *Ves.*, 276, *Carlisle vs. Wilson.* 1 *Sch. & Lef.*, 305, *O'Connor vs. Spaight.* 2 *Md. Rep.*, 174, *Williams vs. West.* Again, the fund has been brought into court upon the bill of Tracy, asking for an account and discovery, and for an injunction, and where a court of equity has once got jurisdiction it will go on and administer full relief to save litigation. 2 *Johns. Cases,* 431, *Armstrong vs. Gilchrist.* 10 *Johns.*, 587, *Rathbone vs. Warren.* Again, though Ketchum is not a partner, yet looking to the terms of his agreement, in reference to its jurisdiction, a court of equity will apply the same doctrines which are applicable in the cases of partnership. 1 *Story's Eq.*, sec. 465, *note* 6.

As to the appeal of Tracy:

His appeal is properly before the court so far as the decree adjudicates between him and Ketchum, but he has filed no answer, is in default, and has taken no exceptions to the averments of the bill, and made no objection to the jurisdiction of the court. After the decree he came in and asked leave to file his answer, but such leave was never granted, and the court below has not decided the question of his right thus to come in and answer, and that question is not now before this

court.  Prior to the decree no proof was offered on his part, except the *agreement* between Benson and himself, of the 23rd of November 1852, and we insist therefore:

1st.  That the claim of Tracy, even if valid as against Benson and Jewett, or Benson alone, has no force as against Ketchum, being of subsequent date, in derogation of Ketchum's rights, and not an expense within the meaning of Ketchum's contract.

2nd.  That whatever may be the incompetency of Jewett and Benson to dispute the consideration of the agreement with Tracy, Ketchum, as a prior incumbrancer on the fund, is entitled to proof thereof, such agreement not being even *prima facie* evidence against him.  The agreement with Ketchum, on the contrary, being of prior date is *prima facie* proof against Tracy, and has not been contradicted.

3rd.  That Tracy's claim is proven affirmatively to be without foundation, and is, besides, immoral in its alleged consideration, and against public policy.  His own evidence even, if properly in, shows no services whatever on his part, and his contract itself recites a consideration which was never performed, for the Peruvian Minister never did consent to load *"all said vessels,"* as therein stated.

*T. Parkin Scott,* for Tracy, argued:

1st.  That the agreement made on the 23rd of November 1852, between Tracy and Benson, was *bona fide* and unexceptionable.  There is nothing in the conduct of Tracy in this matter; to involve him in any way in the charge of immorality or fraud.  From the long acquaintance and friendship existing between him and De Osma, and his familiarity with the subject, Tracy would be likely to present such views to De Osma as would have brought about the arrangement under which the guano was obtained, and the proof in the case, and especially in the supplemental record, shows that his influence did bring about this arrangement, and his services having brought about and helped to produce the fund in court, he is entitled, under his agreement, to be paid out of it.

2nd.  That Tracy's interest is affected by the opinion and

decretal order of the 27th of March 1857, and he is entitled to an appeal and review of that order and action of the court below. *5 Gill,* 359, *White vs. White.* 1 *Md. Ch. Dec.,* 328, *Ches. Bank vs. McClellan.* 3 *Md. Rep.,* 528, *Ware vs. Richardson.* 12 *G. & J.,* 275, *Clagett vs. Crawford.*

3rd. That as Tracy's case was depending, and the fund was brought into court under his bill, so that the court had judicial knowledge of his claim, and his testimony was not then in court, it was error in the court then to pass on his claim.

4th. That the court ought to have permitted Tracy to file his answer, and ought to have consolidated the cases and heard them together. *Act of* 1820, *ch.* 161, *sec.* 3. 2 *G. & J.,* 28, *Gibbs vs. Clagett.* *Ibid.,* 311, *Dorsey's Adm'r vs. Barton.* 6 *G. & J.,* 323, *Crawfords vs. Taylor.*

5th. That the claim of Ketchum being for supposed services to enable Benson to obtain guano from the Lobos Islands with the sanction and protection of the United States government, and such sanction and protection having been refused, there is no consideration for the support of the supposed contract between Ketchum and Benson.

6th. There is no question of jurisdiction as to Tracy's claim. Ketchum, however, has no claim on this *fund,* and whatever claim he has, it is a claim *at law,* and not in *equity.* The fact that his bill claims an *account* does not, according to Maryland law and practice, give a court of equity jurisdiction. He has no *lien* on the fund which equity can enforce, because the original agreement on which his claim rests, does not constitute him a *partner* in the transaction. By it he was to receive "a sum or sums of money *equal to the quarter part*" of the net profits on each ship, and this does not make him a *partner,* and he has, consequently, no *lien* on this fund, even conceding that his contract is valid, and that the consideration thereof did not fail.

LE GRAND, C. J., delivered the opinion of this court.

This is an appeal from a specific action of the Circuit court for Baltimore city. On the 27th day of March 1857, the court

declared, in its opinion, that Hiram Ketchum was entitled "to have and recover from the defendants, Benson and Jewett, *with preference and without regard to any claim or alleged right of the defendant, Tracy,* one-fourth part of the net profits arising from sales of all cargoes of guano, if any such there were, obtained by the said Benson and Jewett, from the Lobos Islands, in vessels chartered, or caused to be chartered, by said Benson and Jewett, for the purposes, and within the period set forth in their contract with the said complainant, proven under the commission in these proceedings, and marked complainant's exhibit, No. 5, as well as one-fourth part of the net profits of the voyages of those of the said vessels, whereof the charter-parties were transferred to F. Barreda & Brother, the agents of the Peruvian government, to bring guano to the United States from the Chincha Islands, and which did actually bring such guano under such transferred charters, and earn advance freight thereupon, under such transfer, in pursuance of the agreement of said Benson with F. Barreda & Brother, proved under the commission aforesaid, and a copy whereof thereto attached, is marked complainant's exhibit, No. 1, deducting first, however, from said proceeds of sale, if any, and said profits or earnings, all reasonable and proper expenses and disbursements of said Benson and Jewett," &c., &c., *"the alleged claim of the said defendant, Tracy, being no part of said expenses, for the purposes of said deduction."* The opinion proceeds to say, "that the fund now invested under the order of this court," is liable to the payment of the claim of the complainant when its amount is ascertained, and directs the auditor to state an account and apply the fund agreeably to the instructions given.

The fund in court arose from freights on importations of guano. Without going into a long detail of the facts which led to the enterprise, or a full statement of the incidents which, in its various phases, characterized it, we content ourselves with an examination of the basis on which rests the claim of the complainant, and the decree of the court allowing it, and to that end subordinating, if he have any, the claim of the appellant, Tracy, to it.

In the argument of the cause much was said, and ably said, pro and con, in regard to the jurisdiction of a court of equity in a case like the present. We entertain no doubt that the jurisdiction is complete, and that the authorities are full up to the question, but, inasmuch as the view we have of the merits of the case makes the question of jurisdiction unimportant, we forego all citation of cases to show it has properly attached. For, if the complainant has not made out his case, the question of jurisdiction is of no consequence. We are clearly of opinion, that he has wholly failed to prove any claim whatever to any part of the fund. His pretensions, whatever they may be, rest entirely on the paper signed by Jewett and Benson, and dated June 30th 1852, and the paper signed by the same parties, dated the 24th day of May 1853, and the schedule thereto attached.

The first of these papers recites that Benson and Jewett were doing business in the city of New York, and had caused to be chartered a number of vessels to proceed to the Islands of Lobos, in the Pacific ocean, to obtain cargoes of guano, to be disposed of as an article of commerce, and that they intended to become interested in other vessels for the same purpose during the ensuing six months. After this recital it proceeds to say that "in consideration of valuable services rendered us (Benson and Jewett) in respect to the obtaining access to and procuring said guano by Hiram Ketchum, of the city of New York, we do hereby jointly and severally promise said Hiram Ketchum, *to pay him a sum or sums of money equal to the quarter part of our net profits on each and every ship,* (deducting, first, therefrom the expenses, commissions, &c., for doing the business,) as aforesaid chartered and hereafter to be chartered by us, or either of us, during the ensuing six months," &c., &c.

The other paper—the one of date the 24th day of May 1853—is a memorandum of agreement between Jewett and Benson to define their mutual and respective interests in the guano expedition, and their relative rights as co-partners in all the charters of vessels, the arrangement between the government of the United States and Peru, the moneys received or

45　　v. 14.

to be received on account thereof, and the liabilities therein. This memorandum ascertains the interests and liabilities of the parties to be equal, and that "the liabilities in *an annexed* schedule stated, are to be paid as therein provided, but no payment of any sum of money whatever shall be made by either party *without consent of the other.*" Among the statements in the schedule is the following:

"C. Amount payable to H. K., as per agreement, and payable whenever Benson and Jewett shall agree to pay the same, each advancing his half."

On the 8th day of January 1853, Benson entered into an agreement with F. Barreda & Bro., to endorse to them the charter-parties to certain vessels, to receive therefor certain specified freights, provided that the captains of the vessels agree to load at the Chincha Islands instead of the Lobos Islands.

The fund invested by order of court, and out of which Ketchum asks to be paid, grows out of these freights, and was brought, under the direction of the court, in a suit instituted by the defendant, Tracy, who claimed to have a lien on the same for services rendered to Benson.

The projected expeditions to the Lobos Islands were under the sanction of the State Department, which, as appears from certain letters of Mr. Webster, the then Secretary of State, was of the opinion that those islands did not constitute any part of the territory of Peru, an opinion afterwards recanted, and followed by an official recognition, by our Government, of the right of Peru to those islands. In consequence of an arrangement of our government with the minister of Peru, as alleged by Tracy brought about through his instrumentality, the charter-parties of Benson, to a certain extent, were recognized on certain conditions, which were to be effected through an agreement to be made with F. Barreda & Brothers, the agents of the Peruvian government, for the disposition of guano in this country. The agreement of Benson, to which we have referred, with that house, is the one which consummated the understanding.

The services, for which the complainant was to be compensated, were rendered, to use the language of the paper of the

30th of June 1852, "*in respect to the obtaining access to and procuring said guano* (that is, from the Lobos Islands,) *by Hiram Ketchum.*"

The whole proof in the cause shows, that in point of fact *access* was not had to those islands, nor guano obtained from them. The whole thing was founded on a delusion, namely, that any citizen of the United States has the right to visit and procure guano from those islands, without the permission of any one, when these islands were, and are, as much a part of the territory of Peru as its capital. There was a total failure of consideration, and, therefore, the complainant cannot, in justice, found a claim for services wholly nugatory and valueless. Nor can he maintain a lien on the fund in court, unless he were a *partner* in the charter-parties transferred to F. Barreda & Brother, of the freights of which it originated. He was *not* to receive one-fourth of the net profits, which would have made him a partner, but a sum of money "equal to the quarter part of the net profits," which did not constitute him one. He was in nowise liable for any losses or engagements of the concern.

Entertaining these views, we will dismiss the bill of the complainant. We avoid expressing an opinion on the validity of the claim of Tracy. He has not fully exhibited his case in proof. When he shall have done so, in the suit brought by himself, now pending, the Circuit court will be in a condition more thoroughly to pass upon it.

The case of *Purviance* and *Dorsey, Adm'r of Dorsey, vs. Barton's Adm'r de bonis non,* 2 *Gill & Johnson,* 311, shows, that the decree *pro confesso* does not preclude Tracy from the benefit of having his testimony considered before final decree.

*Decree reversed with costs and bill dismissed.*

(Decided July 15th, 1859.)